518 A.2d 1224

Leo COLAROSSI and Shirley Colarossi, his wife, Appellants,

v.

Ernest N. FABER and Francis J. Faber, Co-Executors of the Estate of Cecilia T. Faber and Emeryville Trucking, Inc., a Corporation, Appellees.

Superior Court of Pennsylvania.

Argued May 21, 1986.

Filed Dec. 3, 1986.

Joseph J. Bonistalli, Pittsburgh, for appellants.

Michael R. Ford, Pittsburgh, for Faber, appellees.

Emilio P. Fastuca, Pittsburgh, for Emeryville, appellee.

Before BROSKY, KELLY and ROBERTS, JJ.

KELLY, Judge:

This is an appeal from the trial court's determination as to which of two leases presents a superior right to possession of the leasehold property. Appellants claim right of

possession by way of a lease entered into in 1968 by the owner/lessor and appellant's assignors-in-interest. Appellees claim not merely the superior right of possession, but also right of first refusal, by way of a 1958 lease agreement between the owner's attorney-in-fact and appellee's assignors-in-interest. This appeal arises from a July 16, 1985 Order dismissing appellants' exceptions, and entering as final, on August 3, 1983, the Decree Nisi awarding appellees the right of first refusal to buy the leasehold.

The action commenced when Leo and Shirley Colarossi, appellants herein, filed a complaint in equity claiming superior right to possess certain real property situated in Marshall Township, Allegheny County. Appellees, Ernest and Francis Faber, are the sons of Cecilia T. Faber, the deceased owner of the disputed property. Appellee Emeryville Trucking, Inc., was the assignee of a leasehold interest in the property. Appellees denied appellants' claims of superior interest in the property. After a bench trial, the Honorable Ralph H. Smith, sitting as chancellor, entered an adjudication and Decree Nisi, which were embodied in the court's Order of August 3, 1983, dismissing appellants' complaint. Appellants' exceptions were denied on July 5, 1985 and the final decree entered on July 16, 1985. Appeal to this court timely followed.

The chancellor found the following to be the dispositive facts in this matter. Cecilia T. Faber was the owner of record of the previously mentioned plot of real estate in Allegheny County. On April 9, 1958 Farber signed a written power of attorney, appointing Clarence G. Barth, hereinafter Barth, as her attorney-in-fact. The pertinent portions of this agreement read as follows:

POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that I, Cecilia T. Faber, have made, constituted, and appointed, and by these presents do make, constitute and appoint Clarence G. Barth of Ross Township, Pennsylvania, Attorney-at-law, my true and lawful attorney, for me, and in my

name, place and stead, *to let and demise my real estate in Marshall Township,* Allegheny County, Pennsylvania, for the rental of $200.00 per month; *Giving and granting unto my said attorney full power and authority to do and perform all and every act and thing whatsoever, requisite and necessary to be done in and about the premises, as fully to all intents and purposes as I might or could do, if personally present; hereby ratifying and confirming all that my said attorney shall lawfully do* or cause to be done by virtue hereof.

(Emphasis added).

On May 12, 1958 Faber, by Barth, entered into a lease with West Penn Forwarding Company, hereinafter West Penn, to lease for a period of 25 years the property in question. Attached to the lease was a piece of paper entitled "Exhibit B" which provided that the lease agreement could be sublet or assigned. It further provided that:

In consideration of the execution of this lease and rentals to be paid hereunder *lessor agrees* that at all times during the term of this lease or extension thereof, *lessee shall have the right to buy the leased property in the event lessor wishes to sell it.* Before selling the property to anyone else, *lessor will first offer to sell it to the lessee at the price lessor is willing to accept,* such offer to be made in writing and mailed to lessee's last known address.

(Emphasis added). Both documents were signed by Barth, "attorney-in-fact for Cecilia T. Faber."

Thereafter, in 1965, West Penn, by written document, assigned its lease to Wexford Motor Sales, Inc., hereinafter Wexford. The assignment agreement further stated:

5. It is a condition of THIS AGREEMENT:

.    .    .    .    .

c. That both the written Power of Attorney, and the Lease and Exhibit "B", being Schedule "A" hereof, will be accepted by the Recorder's Office of Allegheny County, Pennsylvania, for recording, prior to the con-

summation of this agreement on or before August 1, 1965.

The lease, Exhibit "B" and assignment were never recorded. (Trial Ct.Op. 8/3/83 at 7).[1]

The leasehold interest changed hands yet again. Wexford, by written agreement, assigned its interest to Frank Rezzetano on April 15, 1971. Rezzetano elected, as per the original agreement, to extend the lease period to April 30, 1978. Rezzetano died on September 30, 1976, and his estate assigned his interest to appellee Emeryville.

On April 25, 1978, just prior to the termination of the leasehold, Faber, by way of Barth's successor, offered to sell to Emeryville the subject property for the price of $175,000. The offer was accepted on April 27, 1978, and the parties entered into a written agreement of sale and purchase on April 28.

However, approximately ten years prior to this, Faber, on November 11, 1968, entered into a lease for the same property with the Sun Oil Company, hereinafter Sun, for a term of fifteen years with options to renew for five-year periods. A rental fee of $50.00 was to be paid monthly commencing February 1, 1969, until thirty days after Sun received possession of the premises. Once possession was received, the rental fee was to increase to $250.00 monthly. Sun knew of the existence of the prior Faber-West Penn lease and had seen a copy of that lease including Exhibit B [which gave the lessee the right of first refusal to purchase the property in question.] (N.T. 172). The Sun Oil lease contained a right-of-first-refusal clause as well as an option-to-purchase clause:

(c) that Company shall have the option to purchase at any time during the term of this lease or any renewal or extension thereof, the said leased premises, including any and all rights, privileges and easements on adjoining lands as herein set forth, for the sum of ONE HUN-

1. Attorney Barth did approve the assignment of the lease. Barth died in 1972; another member of his law firm continued to serve Mrs. Faber but no new power of attorney document was signed.

DRED FIFTY THOUSAND AND 00/100 Dollars ($150,-000.00) ...

(d) *In the event the Lessor desires to sell the within demised premises* or other property owned by Lessor of which the demised premises are a part *at any time during the term hereof or any renewal or extension thereof,* and receives therefore a bona fide offer of purchase acceptable to Lessor, Lessor shall notify Company in writing of said offer and attach thereto a photostatic copy of offer of purchase and *Company shall have the right to meet said bona fide offer by giving Lessor notice in writing of its intention so to do within sixty (60) days after receipt of said offer in writing....*

(Emphasis added). This lease was recorded in the Deed's office of Allegheny County on January 30, 1969. Sun assigned the lease to the appellants on April 1, 1974. This assignment also was recorded in the Deed's office. All rental payments under this lease were paid and accepted by Faber.

The trial court further found as fact that:

11. Emeryville had, prior to April 1, 1978, both actual and constructive knowledge of the Faber-Sun lease and its terms and conditions.

12. Plaintiffs [the Colarossis], at all times since the date of said assignment to them of the Faber-Sun lease, had performed all conditions precedent incumbent upon them and have been and still are ready and willing to comply with the terms of the lease if the defendants comply.

Appellant/plaintiffs, the Colarossis, at trial, and now on appeal, contend that theirs is the superior right of possession and that, therefore, they are entitled to immediate possession of the leasehold property, and are entitled to dispossession damages for the intervening months they have been denied possession. The trial court, however, found that appellee Emeryville, as assignee of the West Penn lease, had the superior right to possession and to purchase the premises.

Appellants raise several issues on appeal. We shall address these issues by analyzing each transaction in the chain of title.

## I. Power of Attorney

■ The chancellor concluded that the power of attorney granted Barth by Faber included the power to grant any lessee the right of first refusal of the leased premises. The chancellor also questioned the standing of the appellants as third parties to challenge the agreement.

We note initially that:

> Our scope of review of an adjudication in equity is well established. A chancellor's findings of fact, affirmed by the court *en banc*, have all the force and effect of a jury's verdict and will not be disturbed on appeal if there is sufficient evidence to sustain such findings. *Piercing Pagoda, Inc. v. Hoffner*, 465 Pa. 500, 351 A.2d 207 (1976) ... It is equally well settled that a chancellor's conclusions, whether of law or ultimate fact, are always reviewable as they are no more than his reasoning from the underlying facts. *Chambers v. Chambers*, 406 Pa. 50, 176 A.2d 673 (1962).

*Village Beer and Beverage, Inc. v. Cox and Co., Inc.*, 327 Pa.Super. 99, 102, 475 A.2d 117, 118 (1984).

First, as potential successors to the leasehold, appellants are clearly real parties in interest. Secondly, the scope and effect of the authority granted by Faber to Barth by virtue of the power of attorney is an issue worthy of closer scrutiny than afforded by the trial court.

Our analysis of the chain of title of possessory interests in this property must necessarily begin with determination of the scope of Barth's authority as attorney-in-fact. Therefore, our analysis revolves around agency principles of law. The specific agency relationship presented herein involved the grant to Barth of a power of attorney. Such powers are to be strictly construed; the existence of a limitation upon the authority conferred will also be strictly construed. *Fierst v. Com. Land Title Ins. Co.*, 499 Pa. 68, 451 A.2d 674 (1982). Nonetheless, "[p]owers expressly granted will not

be restricted by implication nor will a construction be made which will effectively defeat the very purpose of the agency." *Nuzum v. Spriggs,* 357 Pa. 531, 533, 55 A.2d 402, 403 (1947).

In creating the agency relationship herein, Faber granted Barth the power to "let and demise" the subject property. A demise is defined as:

> A conveyance of an estate to another for life, for years, or at will; most commonly for years; a lease, 1 Steph. Comm 475. *Priddy v. Green,* Tex.Civ.App., 220 S.W. 243, 248. Originally a posthumous grant; commonly a lease or conveyance for a term of years; sometimes appplied to any conveyance, in fee for life, or for years. Pub.St. Mass. 1882, p. 1289.

Black's Law Dictionary 388. (5th ed. 1979). Thus to "let and demise" is synonymous with "to lease".[2] Barth did lease the premises to West Penn and thus acted within the permissable scope of his authority.

Barth, however, in addition to giving West Penn a lease agreement, also gave West Penn a contract, "Exhibit B", purporting to give West Penn a right of first refusal.[3] A grant of the right of first refusal is a contract contemplating the eventual or potential sale of the leased premises.

**2.** Demise, the verb, is defined:
**DEMISE, v.** In conveyancing. To convey or create an estate for years or life; to lease. The usual and operative word in leases: "Have granted, *demised,* and to farm let, and by these presents do grant, *demise* and to farm let."
Black's Law Dictionary 551 (3rd ed. 1933).

**3.** Appellant argues that Exhibit B is not properly to be construed as a part of the lease agreement as being extraneous to the "four corners" of the lease. We note that:
> Any number of documents can be taken together to make out the necessary written terms of the bargain provided there is sufficient connection made out between the papers, without the aid of parol evidence, further than to identify papers to which reference is made, but not to supply a material term of the contract. Volume 4, Williston on Contracts, Third Edition, page 128.

*Haines v. Minnock Construction Co.,* 289 Pa.Super. 209, 215–16, 433 A.2d 30, 33 (1981). However, we need not determine whether Exhibit B is to be construed as part of the lease or as a separate document since it makes no difference to our determination herein.

A similar "right of refusal," as it is commonly called, has been analyzed by Professor Corbin in the following terms: "This contract created no option in either party. If [a third party] should make an offer the owner of the land was privileged not to accept it, and also not to make any offer to the promisee. But the owner was bound by duty not to accept the offer of the [third party] without first giving an option to the promisee." Corbin, op. cit. at p. 363.

*Gateway Trad. Co. v. Children's Hospital of Pittsburgh,* 438 Pa. 329, 265 A.2d 115 (1970). By contrast, under an option to purchase, the optionholder has acquired the power to accept an offer (irrevocable during the option period) by an appropriate means, thereby effecting a binding contract. *See* Corbin, *Contracts* (1952), Chap. 11; Restatement (Second) of Contracts, § 25 (1979). The irrevocable offer is usually for a fixed amount, open for a fixed and specified option period. An examination of "Exhibit B" reveals that there was no certainty of terms, either as to price or as to option period, that would transform the language into an option to purchase.

Although this particular "right of refusal" does not mention the existence of any third party making a first offer, it is clear that Barth was purporting to make a promise on Faber's behalf, to offer to sell the property to the leaseholders before selling to any other party. Appellant argues that the language of Exhibit B created an option to buy and that this option is too vague to be capable of specific performance. We disagree with appellant's interpretation. Exhibit B grants a right of refusal, not an option to buy; such a right of refusal is capable of being enforced by a court as a valid grant of property interest. *See Atlantic Refining Co. v. Wyoming National Bank,* 356 Pa. 226, 51 A.2d 719 (1947).

Regardless of whether Exhibit B grants a right of refusal or an option to purchase, we must narrowly construe the language of the grant of authority in the power of attorney. We cannot expand the specific purpose for the grant, to let

and demise the property, to include an agreement to also negotiate the property's potential sale. Power to lease and power to sell are necessarily separate and distinct.[4] We conclude that Barth's action of granting West Penn a right of first refusal was unauthorized by Faber.

■ We must next determine whether this unauthorized act was ratified by Faber. When a contract is entered into by parties lacking authority to contract, that agreement may be voided; however, a principal may ratify an act of an agent, or may modify the original agency relationship, by acquiescing to the new exercise of authority.

> A modification of an agency relationship may occur where a principal acquiesces in conduct not included in the original authorization. See Restatement (Second) of Agency, supra, §§ 43, 94. The Comment to Section 43 adds: 'Persons ordinarily express dissent to acts done on their behalf which they have not authorized or of which they do not approve.' Restatement (Second) of Agency, supra, at 133.

*Scott v. Purcell*, 264 Pa.Super. 354, 363, 399 A.2d 1088, 1093, *aff'd* 490 Pa. 109, 415 A.2d 56 (1979). *See also* Restatement (Second) Contracts §§ 7, 12. However, ratification is conditioned on the premises that the act to be ratified is lawful and that the principal is fully informed by the agent as to the particulars of the act. *Scott, supra,* 264 Pa.Superior Ct. at 366 n. 4, 399 A.2d at 1094 n. 4; Restatement (Second) Agency § 98.

We conclude that Faber ratified Barth's actions in granting a right of refusal to West Penn. First, Faber never disavowed Barth's actions during his lifetime;[5] silence on

**4.** Reference to the broader grant to Barth of discretionary authority, i.e., the grant of power to do everything requisite and necessary, similarly does not persuade us that the grant of a right of first refusal was reasonably contemplated as necessary or requisite to the leasing of the property. Rather, this clause, if it conveys any specific power, merely confers upon Barth the duty to maintain the leased premises in satisfactory condition. *See Zidek v. Forbes National Bank,* 159 Pa.Super. 442, 48 A.2d 103 (1946).

**5.** The death of an agent terminates authority. Restatement (Second) Agency § 121.

her part signifies acquiescence. *See Turnway Corp. v. Soffer*, 461 Pa. 447, 336 A.2d 871 (1975). Secondly, Faber had knowledge of the terms of the West Penn lease in 1968 when she and Barth conducted negotiations with the Sun Oil Company. (N.T. at 158–162). Third, Faber clearly was aware of, and endorsed Barth's actions when, in 1978, she offered the premises for sale to assignee, Emeryville.

Faber had knowledge of the facts of her agent, and the acts of her agent were lawful. Faber's actions over a twenty year span are inconsistent with any purpose other than ratification of the contract; accordingly, we find Faber ratified the actions of her agent, Barth. Thus, while we find the chancellor did misconstrue the power of attorney, as appellant claims, nonetheless that misconstruction is harmless error due to our finding of ratification.

## II. Assignment of Lease to Wexford Motors

■ Appellant next contends that the assignment of the lease from West Penn to Wexford Motors was improper and without effect because of failure of a condition precedent. Specifically, appellants argue that the failure of Wexford to have the lease and Exhibit B recorded defeated the transfer of interest in the leasehold. We are thus called upon to construe the operative language of the assignment: "It is a condition of this agreement ... that both the written power, and the lease and Exhibit B ... will be accepted by the Recorder's Office of Allegheny County ... prior to the consummation of this agreement on or before August 1, 1965." None of the documents were ever recorded by Wexford.

> The general rule remains that where an act or event mentioned in a contract is not *expressly* made a "condition precedent," it will not be construed, unless such clearly appears to be the intention of the parties.... As our Supreme Court has held, *the actions of the parties pursuant to an agreement between them are significant and substantial evidence in determining whether they intended to be bound by the agreement.*

*American Leasing v. Morrison Co.,* 308 Pa.Super. 318, 327, 454 A.2d 555, 559, 560 (1982). (Citations omitted). (Emphasis added).

We agree with the trial court that the language in question expressly created a condition precedent. However, failure to comply with the condition does not vitiate the transfer of the interest; the actions of the parties evince that they intended to be bound by the agreement in spite of the failure of the condition precedent. West Penn did not claim breach of the assignment agreement, and allowed the transfer of possessory interest to occur. Neither party is now disputing the agreement or transfer of the leasehold. Therefore, we affirm the trial court's determination that the lease interest was passed from West Penn to Wexford Motors.

### III.   Faber's Lease to Sun Oil Company

█ The trial court found as fact that it was the intention of both appellee Faber and the Sun Oil Company that their lease not grant Sun the immediate right of possession but only promised that "vacant possession would be delivered to Sun or its assignee, upon the termination of the then current prior lease." Sun was paying a monthly rental of fifty dollars to maintain their option to gain possession of the leased property upon expiration of the previous West Penn lease.

Sun drafted the language of the lease. Thus we must interpret and construe any ambiguous portions strongly against Sun.

> Where the words of the contract are clear and unambiguous, the intent of the parties must be determined from the agreement itself. *Kennedy v. Erkman,* 389 Pa. 651, 133 A.2d 550 (1957). One part of a contract cannot be so interpreted as to annul another part, but, rather, writings which comprise an agreement must be interpreted as a whole. *Shehadi v. Northeastern National Bank of Pennsylvania,* 474 Pa. 232, 378 A.2d 304 (1977). Ambiguous language in a contract is to be interpreted most strongly against the party who selected the language.

*West Penn Realty Co. v. Acme Markets, Inc.*, 224 Pa.Super. 202, 303 A.2d 836 (1973).

*Village Beer and Beverage, Inc. v. Cox, supra,* 327 Pa.Superior Ct. at 107, 475 A.2d at 121. We find a number of problems of construction in the Sun lease.

To begin, Sun knew of the prior West Penn lease, including Exhibit B, which granted West Penn and its assignees a right of refusal. Nonetheless, Sun included a right of first refusal in their second lease. (N.T. at 170). The Sun lease never mentions the right of first refusal granted to West Penn and its assignees. This Court must therefore determine how Sun's right of refusal would operate so as to also give effect to the West Penn right of refusal.

We hold that Sun's right of first refusal, and its possessory interests, must yield to the rights of the first leaseholder in interest, appellee Emeryville. *See National Forge Co. v. Carlson,* 452 Pa. 516, 307 A.2d 902 (1973). Accordingly, appellants' interests, as assignees of the Sun lease, are subordinate to those of Emeryville.

Thus, when we construe the Sun lease in the context of Sun's knowledge of the prior West Penn lease, we find Sun's right to enter into possession of the premises was conditional. Sun's rights were conditioned on the fact that the tenant in possession under the West Penn lease would not exercise its right of refusal and accept an offer to buy the leased premises. Sun's rights under the lease would become executory only if West Penn did not opt to buy the premises.

Sun apparently accepted this conditional status, and the risks involved, because Sun operated under the assumption that the tenant in possession under the West Penn lease would not exercise the right of refusal. For instance, one of the negotiating agents for Sun testified:

Q. Now, you mention the sale was really not an issue with you?

A. Yes, it was. I attempted to buy the property first prior to leasing it.

Q. No. I meant Mr. Rezzetano's, a sale to Mr. Rezzetano [the tenant in possession under the West Penn lease].

You said that was not an issue with you?

A. No, sir.

Q. It was not an issue with you because you didn't think he had the ability to go through with the sale, correct?

A. That's correct.

Q. Because he was financially strapped?

A. Yes, sir.

(N.T. at 188). Sun apparently overlooked the possibility that the West Penn lease could be assigned to a party capable of purchasing the property. To Sun's misfortune, this possibility became reality; the prior lease did not expire, but rather, the right of refusal was exercised. Consequently, the Sun lease never became executory.

This is the only interpretation consistent with the language of both lease documents, the intent of the parties, and Sun's knowledge of the prior lease. Appellants, as Sun's assignees, had both constructive and actual knowledge of West Penn's lease. Appellants' interest in the leased premises were subject to the superior rights contained in the West Penn lease.

IV. Faber's Offer of Sale to Emeryville

■ Appellants argue that Faber's grant of the right of first refusal to Sun under the second lease signifies her repudiation of the previous West Penn lease. We disagree. As previously noted, Faber did not draft the agreement; Sun drafted the lease. Thus we cannot impute to Faber any such intention of repudiation. Rather, as stated previously, Faber signed a lease with ambiguous provisions, which, construed against the draftor, Sun, never became executory due to the sale of the premises to Emeryville. *West Penn Realty Co. v. Acme Markets, Inc.*, 224 Pa.Super. 202, 303 A.2d 836 (1973).[6]

6. We also note that Sun included language regarding a potential sale of the premises when Sun knew that Mrs. Faber had no intention of

Appellants also argue that Faber should be estopped from executing the agreement of sale with Emeryville in light of the "intervening, fully paid, recorded rights of Sun Oil Company and its successors." Appellant's Brief at 27. However, because we hold that Sun's intervening rights were conditional and never became executory, we find no need to discuss the issue of estoppel. As to appellants' contention that they are entitled to dispossessory damages, we find this argument moot, in light of the determination that Sun had no right to enter into possession of the premises.

Accordingly, we affirm the decree of the trial court.

selling the premises. The Sun agent who negotiated and drafted the lease agreement testified:

A. ... I was told that the property was not for sale and would not be for sale.

Q. Who told you that?

A. Mrs. Faber and Mr. Barth.

Q. Did Mrs. Faber ever give you a reason why the property was not for sale?

A. She stated that she wanted income to take care of herself in her later years and would not sell the property under any circumstances. Mr. Barth cautioned me if I would pursue this avenue I would have no further contact and negotiate with Mrs. Faber.

(N.T. at 157). Nonetheless, Sun disregarded Mrs. Faber's stated intention and included an option to buy for the specified price of $150,000 in the lease. The Sun agent's explanation to Mrs. Faber for including the option clause in the lease was that it was necessary to do so, otherwise his superiors at Sun would not be convinced to assent to the lease. Thus Sun's theory of repudiation is further rebutted; quite simply, the record indicates that Mrs. Faber intended that the option clause never be evoked. (*See* N.T. at 176, 177).